Karra J. Porter, 5223
Karra.Porter@chrisjen.com
Anna P. Christiansen, 17518
Anna.Christiansen@chrisjen.com
CHRISTENSEN & JENSEN, P.C.
257 East 200 South, Suite 1100
Salt Lake City, Utah 84111
Telephone: (801) 323-5000
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## IN AND FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| UTAH ANIMAL RIGHTS COALITION, a non-profit corporation; DIRECT ACTION EVERYWHERE SF BAY AREA, an unincorporated association; CURTIS A. VOLLMAR, an individual; ALEXANDER J. TAYLOR, an individual; and MAXWELL J. CORWIN, an individual; | **COMPLAINT**<br><br>**AND JURY DEMAND**<br><br>Civil No. 2:22-cv-00497-CMR<br><br>Magistrate Judge Cecilia M. Romero |
| Plaintiff, | |
| v. | |
| BEAVER COUNTY, a political subdivision; CAMERON NOEL, an individual; WARREN G. WOOLSEY, an individual; and LONNIE LAWS, an individual; | |
| Defendants. | |

Plaintiffs Utah Animal Rights Coalition ("UARC"), Direct Action Everywhere SF Bay Area ("DXE"), Curtis A. Vollmar, Alexander J. Taylor, and Maxwell J. Corwin (collectively "Plaintiffs"), by and through their counsel of record Karra Porter and Anna P. Christiansen, hereby complain against Defendants Beaver County, Cameron Noel, Warren G. Woolsey, and Lonnie Laws (collectively "Defendants") as alleged below.

**INTRODUCTION**

"It is no accident that public streets and sidewalks have developed as venues for the exchange of ideas. Even today, they remain one of the few places where a speaker can be confident that he is not simply preaching to the choir. With respect to other means of communication, an individual confronted with an uncomfortable message can always turn the page, change the channel, or leave the Web site. Not so on public streets and sidewalks. There, a listener often encounters speech he might otherwise tune out. In light of the First Amendment's purpose 'to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail,' this aspect of traditional public fora is a virtue, not a vice." *McCullen v. Coakley*, 134 S.Ct. 2518, 2529 (2014).

The Supreme Court's admiration for the First Amendment does not appear to be shared by the Sheriff of Beaver County, Utah and some of his deputies. On July 23, 2022, a group of five individuals traveled to Beaver, Utah, to exercise their First Amendment rights as others have done since our country was founded: They sat, stood, and walked in public fora, asking passersby if they were interested in talking about an issue of public importance. If not, that was fine; they moved on. We are all familiar with this form of speech, a cornerstone of our democratic republic regardless of whether we like or dislike a speaker's views.

Two members of the group sat at a table with handouts. Two members walked in a public park. The fifth member began his outreach in the park before moving to a public street corner. They each took the same approach to their outreach, asking passersby if they had heard about "the Smithfield trial." (The meaning of this reference is described below.)

The defendants do not like plaintiffs DXE or UARC, and did not like what their representatives were saying, including their references to "major" local employer Smithfield

Foods. The community had been in conflict with DXE for "four years," defendant Woolsey said, and blamed DXE for a recent decision by Smithfield Foods to "shut down".

Upon learning that representatives of DXE and UARC were in Beaver engaging in outreach, the Sheriff initiated a campaign to target all five activists with the admitted purpose of forcing them to stop their outreach and "leave". One by one, each member of the group was threatened, harassed, and ultimately expelled by the defendants.

Defendants' unconstitutional actions – most of which were recorded on video – included:

- Defendant Noel ordered the two activists in the public park (Leo, Alex) to stop engaging in speech or he would arrest them.

- Defendant Noel ordered the two activists seated at the table (Alison, Max) to stop engaging in speech or they would be arrested.

- Defendant Noel told all four activists that, if they would be "killed" (presumably by the local citizenry, although he did not specify).

- Defendant Woolsey ordered the activist on the street corner (Curtis) to stop engaging in speech, and cited Curtis for disorderly conduct when Curtis did not immediately agree to comply. Woolsey told Curtis that he was acting at the direction of Defendant Noel, and that the community did not like "[his] group's" views. Among other admissions, Woolsey said, "[Members of the community] have a hard time with people from outside of the community coming in and telling them what they should be believing. They don't believe that in the first place. It just makes them upset…. [I] can't have your beliefs and the beliefs of the community causing any problems."

- Defendant Woolsey and Defendant Laws ordered Curtis to stop filming a law enforcement officer who was in uniform, participating in the encounter, and standing on a public street corner.

These actions and others described below were in blatant violation of Plaintiffs' rights under the First Amendment. Plaintiffs bring this action to remediate past violations, obtain a declaration that defendants' actions are and were unconstitutional, and to enjoin additional violations when Plaintiffs return to Beaver in the ensuing weeks.

## PARTIES

1. Plaintiff Utah Animal Rights Coalition ("UARC") is a non-profit animal rights advocacy organization registered under the laws of the State of Utah.

2. Direct Action Everywhere SF Bay Area ("DXE") is a California chapter of Direct Action Everywhere, an international animal rights advocacy organization. Plaintiffs UARC and DXE are hereinafter collectively referred to as the "Advocacy Org Plaintiffs".

3. Curtis A. Vollmar ("Curtis") is an individual who resides in Berkley, Alameda County, State of California.

4. Alexander J. Taylor ("Alex") is an individual who resides in Berkley, Alameda County, State of California.

5. Maxwell J. Corwin ("Max") is an individual who resides in Salt Lake City, Salt Lake County, State of Utah.

6. Plaintiffs Vollmar, Taylor, and Corwin (collectively the "Individual Plaintiffs") are individuals who are concerned with the welfare of animals and other issues of public importance.

7.      At all times relevant to the Complaint, the Individual Plaintiffs were advocating for animal welfare as an expression of their own personal viewpoints and also with, for, and on behalf of the Advocacy Org Plaintiffs. (Except where otherwise noted, the Individual Plaintiffs and Advocacy Org Plaintiffs are hereinafter collectively referred to as the "Plaintiffs".)

8.      Defendant Beaver County is a political subdivision of the State of Utah.  The Beaver County Sheriff's Office is an agency, program, or arm of Beaver County.

9.      Defendant Cameron Noel is a resident of Beaver County.  At all times relevant to this Complaint, Noel was the Beaver County Sheriff, and was acting within the course and scope of his employment.  Noel was and is the final decision-making authority for Beaver County with respect to the actions alleged herein.

10.     Upon information and belief, Defendant Warren G. Woolsey is a resident of Beaver County.  At all times relevant to this Complaint, Woolsey was a Sergeant in the Beaver County Sheriff's Office and was acting within the course and scope of his employment.

11.     Upon information and belief, Defendant Lonnie Laws is a resident of Beaver County. At all times relevant to this Complaint, Defendant Laws was a deputy in the Beaver County Sheriff's Office and was acting within the course and scope of his employment.

12.     At all times relevant to this Complaint, Defendants Woolsey, Laws, and Noel were acting under color of state law for purposes of 42 U.S.C. § 1983.

## JURISDICTION AND VENUE

13.     This action arises under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983 and 1988. Accordingly, this Court has jurisdiction

pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).  The court has jurisdiction over state law claims under 28 U.S.C. § 1367.

14.     Venue is proper in this Court under 28 U.S.C. § 1391(a) and (b)(2), as the claims made in this occurred and arose in Beaver County, Utah.

## FACTUAL BACKGROUND

15.     In Utah, July 24th is a holiday known as Pioneer Day.  Observations of Pioneer Day occur throughout Utah.  One such event occurred Saturday, July 23, 2022, in Beaver, Utah.

16.     The festivities included "footraces, concession, games, and dinner" at Main Street Park in Beaver, Beaver County, Utah.



*Figure* 1: Flyer *for "Beaver Pioneer Days" Events as promoted to the Beaver County community*

17.    The Main Street Park ("the Park") is a public park.

18.    Prior to traveling to Beaver, Curtis saw the above flyer and contacted one of the DXE "chairpersons" (Brent) and inquired about setting up a table. After the discussion, Plaintiffs packed up their gear (table, flyers, clipboards, etc.) and traveled to Beaver.

19.    Plaintiffs Curtis and Alex, along with non-parties Alison and Leo, are members of DXE. Max is a member of UARC. The group went to Beaver together as part of a partnership

between the Advocacy Org Plaintiffs, which share common interests and a desire to conduct outreach in the Beaver community.

20. After some confusion about where they were allowed to set up, Curtis asked a (non-defendant) Beaver County sergeant, "Is the sidewalk fair game?" to which the sergeant confirmed, "The sidewalk is city property." Plaintiffs set up their table accordingly and began their outreach to passersby. Plaintiff's table was narrow, and Plaintiffs were able to set it up on the park strip while allowing pedestrians to pass on the unobstructed sidewalk.

21. At the table (and later in the park and on the sidewalk), the activists' approach was generally, "Have you heard about the Smithfield trial?"

22. Smithfield Foods is a foreign-owned corporation that operates a number of confined animal feeding operations in the western United States, including one operation in Beaver County.

23. "The Smithfield trial" refers to an upcoming (September 2022) criminal trial in which two persons concerned with animal welfare have been charged with felonies. The criminal charges allege that one or more of the defendant(s) filmed conditions within a Smithfield facility and rescued two dying piglets. These alleged events and the ensuing prosecution have generated significant public discussion, including in media outlets such as *The New York Times*, *Wired*, *The Salt Lake Tribune*, Fox 13 News, and *The Intercept*.

24. If passersby did not respond or indicated a disinclination to talk, Plaintiffs did not further pursue communication with them. If a passerby did express interest, Plaintiffs offered additional oral communication, a petition, and/or a flyer that discussed (among other things) "How a foreign corporation is polluting Utah," inhumane conditions, disease and stench associated with Smithfield's operation, and related issues.



## How a Foreign Corporation is **Polluting Utah**

**REPRESSION**
Smithfield has pushed for unconstitutional laws that criminalize the act of taking a photograph, and is currently **seeking to prosecute 2 nonviolent animal cruelty investigators** for exposing the company's usage of gestation crates.



**FOREIGN INFLUENCE**
Smithfield Foods, which owns Circle Four Farms, is a **subsidiary of China-based WH Group**, which acquired Smithfield for $5 billion in 2013.



**DISEASE**
A report commissioned by neighboring Millard County public health department found **elevated levels of respiratory and digestive disease** after Circle Four Farms was built in the 90s.



**CRUELTY**
**Mother pigs are held in 2' x 7' gestation crates**, where they will never be able turn around or step outside.



**STENCH**
**The smell from Circle Four Farms often travels over 30 miles** into neighborhoods with schools and playgrounds.

## What You Can Do



**FOLLOW THE SMITHFIELD TRIAL**
By joining the action team alerts chat.



**LEARN ABOUT THE PLIGHT OF ANIMALS IN UTAH**
And get involved with others in the state.




uarc
UTAH ANIMAL RIGHTS COALITION

*Figure 2: Plaintiffs' flyer that was handed out to interested passersby*

25.     Many passersby ignored Plaintiffs or declined to speak to them.  One passerby exercised

her own First Amendment rights by calling over, "I love pork!"

26.     After a while, Curtis took his clipboard and walked into the public park. Alex and Leo did the same.

27.     Curtis noticed that other individuals were conducting outreach in the park. For example, Curtis noticed two men who were proselytizing. (These men are believed to have been missionaries for The Church of Jesus Christ of Latter-day Saints.)

28.     While in the public park, Curtis again sought to initiate conversation by asking persons, "Have you heard about the Smithfield trial?"

29.     If a person ignored him or indicated a disinclination to talk with Curtis, he moved on.

30.     No members of the public threatened Curtis or any of his colleagues.

31.     Apparently, a person (or persons) from the community contacted the local sheriff, Defendant Noel. Upon information and belief, the caller(s) complained that people were in the park asking if people had heard about the Smithfield trial.[1]

32.     Defendant Noel drove to the park. Noel located Leo and Alex and told them they would be arrested if they continued their outreach. Noel said words to the effect of, "Don't make us come back. The next guy to show up here is going to beat the shit out of you and I'm not going to be there to protect you. You need to leave now. Do you understand that?"

---

[1] This belief is based upon the fact that anyone disinterested in speaking with Plaintiffs (including presumably the caller(s)) would not likely have heard anything beyond "Have you heard about the Smithfield trial?"

33.  Defendant Noel dislikes the organizational Plaintiffs, their viewpoint, and their speech activities.  Noel has openly expressed these opinions publicly on social media.



*Figure 3: Screen capture of a Sept. 15, 2017 post on Cameron Noel's Facebook page*

34.  Alex feared that, if he offered any pushback such as asking questions or mentioning his rights, defendant Noel might immediately arrest them instead of telling them to leave.  Alex felt the only thing he could do was pack up and leave or risk a high chance of going to jail and missing work with an unexcused absence.

35.     Defendant Noel strode over to Plaintiffs' table.  At the time, Alison and Max were seated there.  Noel did not identify himself as the sheriff, but Alison concluded that he was law enforcement of some kind from the vehicle in which he had arrived.

36.     Alison stood up as Defendant Noel approached.  Noel walked up until he was a few feet away.  Leaning in, he stated loudly (Alison perceived it as yelling), "You *will* be killed and I won't be around to stop them! You are on private property and if you don't leave immediately, I will press charges," or words to that effect.

37.     Alison and Max knew they were on public property.  However, she was frightened by defendant Noel's anger and threats.  She responded, "OK."

38.     Defendant Noel left shortly thereafter.

39.     Alex and Leo returned to the group's table.  Alison began packing up the table, and asked Alex or Max to call Curtis to tell him what had happened.

40.     Curtis returned to the table and gave Alison keys to his car, as it was uncertain whether Alison would be able to continue participating in the outreach because she was upset.  Max, Leo, and Alex were also intimidated by Defendant Noel's threats and demeanor into discontinuing their outreach efforts.

41.     Curtis was disturbed at the local sheriff's harassment of his associates.  However, Curtis had spoken directly with the sergeant earlier and knew that the sidewalk was public property (which he already understood as a matter of basic civics).  Curtis decided to continue engaging in speech on the sidewalk.

42.     Now by himself, Curtis walked up to a street corner.



*Figure 4: Curtis standing on the corner of Main Street and Center Street speaking to Defendant Woolsey*

43. Curtis began engaging in speech again, asking passersby, "Have you heard about the Smithfield trial?" or similar words.

44. Either before or after Curtis positioned himself at the street corner, Defendant Noel contacted Defendant Woolsey and told him that an animal rights group, or a group criticizing Smithfield Foods, or similar descriptor, was reaching out to passersby. Noel directed Woolsey to go down there and stop the outreach.

45. Defendant Woolsey approached Curtis on the sidewalk. A blonde woman began talking with Curtis about the Smithfield trial. Woolsey attempted to interject, but eventually let her engage with Curtis. During their conversation, the woman stated that they (the group) had a right to express their views.

46. Defendant Woolsey engaged in continued efforts to shut down Curtis's speech. During their encounter, Curtis pulled out his cell phone and began recording.

47. At some point during the encounter, Max and Leo approached Curtis and Woolsey. Alison also approached to check on her associates' wellbeing.

48. Upon hearing what Defendant Woolsey was saying to Curtis (described further below), Alison turned around and walked back toward the table. She had already stopped attempting her outreach due to the threats from (the person she later learned to be) Defendant Noel. But she now felt uncomfortable and unsafe at being in public in Beaver. She was struggling to hold back tears. She contacted a friend and expressed how upset she was at the law enforcement harassment.

49. Alison got into the car, shaking and crying. Despite outside temperatures near 100 degrees (and thus much hotter inside the enclosed car), she was afraid to open the door due to what

she had witnessed from local law enforcement. Eventually, Alison was sweating and overheating to the point where she feared she might pass out. She opened the car door, and called an acquaintance with UARC to ask about her colleagues' welfare. Alison was afraid she would be arrested if she went to check on them.

50. Meanwhile, Curtis was being thwarted and threatened by Defendants Woolsey and Laws. Woolsey admitted that he was shutting down Curtis's outreach because of the viewpoint being expressed, including repeated statements that the community did not like "his group's" views about Smithfield Foods.

51. Defendant Woolsey attempted to dissuade Curtis from continuing his speech efforts by claiming, "You have to have a permit."[2] This was a falsehood. No permit was required – or could be required – for Curtis to attempt communication with passersby on a public sidewalk.[3] This principle has been established for decades, and any reasonable or reasonably trained officer would know it. For that reason, Plaintiffs infer that Defendant Woolsey knew he was stating a falsehood. Alternatively, if Beaver County does claim that a permit is required for an individual to engage in speech on a public street corner, then Beaver County has a blatantly unconstitutional policy or ordinance.

52. Curtis replied, "Permit for a sidewalk?"

53. At this point, Defendant Woolsey noticed that Curtis was filming the encounter. Woolsey indicated that he would turn on his own camera, and activated his body cam. Another

---

[2] Defendants Woolsey and Laws mentioned the alleged need for a "permit" again later, never acknowledging that Curtis's outreach had occurred, and was occurring, in public fora (public park and sidewalk).
[3] The same would be true for a public park, which the Supreme Court has described many times as a "quintessential" public forum.

representative of the Sheriff's Office is also believed to have recorded the encounter. (*See* image following ¶ 63 (individual in red shirt appearing to record with cell phone).

54. Defendant Woolsey ignored Curtis's question. Instead, he stated, "You're not to be spreading this. You're not supposed to be down here."

55. Curtis replied, "This is public property."

56. Defendant Woolsey ignored Curtis's statement. He stated, "You're not to be down here doing this. Do you realize that your company [*sic*] caused a problem in our community?"[4]

57. Given that Defendant Woolsey was refusing to respond to Curtis's observations about public property, Curtis asked him, "Do you have anything relevant to say to me?"

58. Defendant Woolsey replied, "Yes, I do." Curtis replied, "OK," and waited for it. Woolsey's "relevant information" turned out to be telling Curtis to stop his speech:

| Woolsey: | "I've asked you to stop." |
| Curtis: | "'k. I'm on public property." |
| Woolsey: | "You need to stop." |
| Curtis: | "'k." |
| Woolsey: | "You need to stop." |

59. At this point, Curtis looked at the sidewalk area next to Woolsey. Woolsey apparently interpreted this as a possible desire by Curtis to start walking on the sidewalk. Woolsey stepped to the side to prevent Curtis from moving past him. (The video shows Woolsey doing this several times, stepping in front of Curtis to prevent Curtis from moving forward.)

60. Having prevented Curtis from moving forward, Defendant Woolsey stated, "Do you realize you're not wanted in this community and you've been asked to leave?"

61. Curtis replied, "I don't care."

---

[4] Plaintiffs understand this reference to "company" to be Plaintiffs DXE and/or UARC.

62. Defendant Woolsey then admitted that his objection was to the views of Curtis and "his group". Woolsey acknowledged that the efforts to drive the activists out of town were (at least in part) due to a perception that prior speech by the advocacy groups had influenced Smithfield Foods to take an action that was unpopular in the community:

| | |
|---|---|
| Woolsey: | "I know you don't care. That's the problem with your group. You just don't care about people or anybody. Do you understand? You've been asked to leave." |
| Curtis: | "All of this for handing out some flyers." |
| Woolsey: | "*All of this because your group has been a direct influence on shutting down Smithfield Foods.* You don't realize that's the major employer in our county." |
| Curtis: | "You don't think I know that?" |
| Woolsey: | "There's a lot of people that have lost their jobs. And you come into this community and pour salt into the wounds of the people that have lost their jobs." |
| Curtis: | "That's not the intent." |
| Woolsey: | "Well, I don't care what the intent is. What you're doing is causing a disturbance in the community." |
| Curtis: | "I'm not trying to cause a disturbance." |
| Woolsey: | "Well, you are." |
| Curtis: | "I'm just trying to have conversations with people." |
| Woolsey: | "You are." |
| Curtis: | "And if people don't want to talk with me I say 'thanks for your time and now on with your day.' " |
| Woolsey: | "I'm going to stand right here and I'm going to tell people not to talk to you." |
| Curtis: | "This is ridiculous. This is very anti-free speech." |

(Emphasis added.) Defendant Woolsey later referred to a "long history" between the community and Plaintiff DXE, "for about four years now."

63. By this point, Defendant Laws had arrived, and Curtis was now essentially encircled by at least five law enforcement officers. To document the show of force, Curtis rotated his camera's perspective to show three other officials standing close to him: two other officials in uniform with badges, and a third official (red shirt) who appeared to be law enforcement.

(This perception was confirmed later when the third individual had several interchanges with County deputies including an exchange of keys.)



*Figure 5: The "volunteer" public official and two persons who responded to the corner of Main Street and Center Street in support of Defendants*

64. One of the three officers (the one pointing at Curtis) announced that he did not "consent" to being filmed. This officer acknowledged that he was a public official, was in uniform and displaying a badge, and was on a public street corner. Nonetheless (and contrary to clearly established law), the officer stated that Curtis could not film him because the officer was not being paid at that particular moment.

65. A reasonable or reasonably trained public official would have known that law enforcement officers (particularly in uniform, wearing a badge, and participating in a law enforcement encounter) may be filmed while in a public area regardless of whether they "consent" or are being paid to be there. (Indeed, the same is true of general members of the public, hence the multitude of "Karen" videos.) The Tenth Circuit has ruled that it is clearly established – and has been for years – that law enforcement may be filmed from public locations.

66. Notwithstanding this clearly established law, Defendants Woolsey and Laws ordered Curtis to cease filming the other law enforcement officer:

> Woolsey: "You need to stop."
> Curtis: "Stop what, Sir?" *[Turns his camera to Deputy Laws.]*
> Laws: "Listen, sir. When someone is asking you like this, a public servant, a volunteer, and he's asking you nicely to please don't film him."
> Curtis: "OK."
> Laws: "And we're asking you to stop filming him."
> Curtis: "OK. I won't film him."
> Laws: "We're giving you a lawful order—"
> Curtis: "Sure."
> Laws: "–to not do that."
> Curtis: "OK."
> Laws: "If you violate that lawful order—"
> Curtis: "Sure."
> Laws: "—then you're causing a disorderly conduct issue–"
> Curtis: "OK, we're not filming him any more. We're filming you two."
> Laws: "—which is a crime."

67. Still on the public sidewalk, Curtis asked a passerby, "Do you know about the Smithfield trial happening?"

68. Defendant Woolsey then interjected, stating "Hey, you need – you don't have a permit to approach people about your product [*sic*], OK?"

69. Curtis (correctly) responded, "I don't need a permit to talk to people on a public sidewalk."

70. Defendant Woolsey then stepped sidewise again to prevent Curtis from potentially moving forward on the sidewalk. The following exchange occurred:

| | |
|---|---|
| Woolsey: | "You're causing a problem in the community." |
| Curtis: | "I'm not. I'm asking people if they want to have a conversation. If they say no, I let 'em go." |
| Woolsey: | "People have come to us. They do not want you here. I'm keeping the peace, and I'm asking you to leave. I'm asking you to leave." |
| Curtis: | "All we're asking people–" |
| Woolsey: | "I'm asking you to leave." |

71. Still attempting to reason with defendant Woolsey, Curtis said, "OK, here's an example of what I'm doing." Curtis then asked some persons standing nearby, "Have you all heard about the Smithfield trial?"

72.     Defendant Woolsey then stepped between Curtis and the people whom Curtis was addressing in order to impede Curtis's communication with them. This exchange ensued (in which both Woolsey and Curtis are directing their comments toward the third parties):



*Figure 6: Curtis showing an example of his speech to Defendant Woolsey*

| Woolsey: | "Everybody, you don't want to talk to this guy. You don't want to talk to him. These are the people that are trying to shut down Smithfield." |
|---|---|
| Curtis: | "That's not true." |
| Woolsey : | *(pointing a finger at Curtis )* "These are the people that are trying to shut down Smithfield." |
| Curtis: | "'s not true." |

73. Defendant Woolsey reinforced his statements with physical gestures driving passersby away from Curtis.

74. At this point, Defendant Woolsey was no longer blocking Curtis's ability to move forward on the sidewalk. In light of Woolsey's actions in physically and verbally preventing further outreach, Curtis began walking south on the sidewalk toward the park pavilion. Curtis then doubled back to the street corner.

75. Defendant Laws, meanwhile, began walking immediately behind Curtis. Laws claimed he was doing so to preserve Curtis's "safety" from local residents, but it is a reasonable inference that this was a falsehood. The residents were, and had been throughout Plaintiffs' presence, law abiding citizens (as Defendant Woolsey later admitted). No member of the general public had threatened Curtis or anyone in his group. The only persons who had alluded to violence (including the activists being "killed") had been the Defendants.[5]

76. Defendant Woolsey began walking next to Curtis, preventing further speech by telling passersby, "Hey, don't stop. Don't talk to these people, they're trying to shut down Smithfield."

---

[5] Consistent with his threat, after Deputy Laws reached the group's table, Laws followed Leo and Alex when they stepped away down the sidewalk, and as they returned.

77.    While Curtis was on his way back to the corner of Center Street and Main Street, a woman expressed interest in Curtis's message. She and Curtis had a brief conversation of approximately five minutes. Defendant Woolsey repeatedly interrupted their conversation.

78.    After Curtis and the woman finished talking, Defendants Woolsey and Laws demanded identification from Curtis, Max, and Leo, despite the fact that no one except Curtis was alleged to have committed any public offense.

79.    Curtis produced his identification card. Max and Leo had to locate theirs.

80.    Defendant Laws followed Max and Leo back to their vehicle first before returning to the outreach table to take their identification cards.

81.    Curtis was left alone with Woolsey on the sidewalk, who then told Curtis to "sit tight" and disappeared with Curtis' identification card.

82.    After approximately five minutes, Woolsey returned and instructed Curtis to follow him over to the outreach table.



*Figure 7: Curtis walking on the sidewalk toward the Main Street Park pavilion with Defendant Woolsey monitoring and interrupting Curtis's outreach efforts*

At the group's table, defendant Woolsey continued to make clear that his actions were due

to the viewpoints of Curtis and the advocacy organizations:

> Woolsey: "The part I want you to understand is there's a lot of hard feelings between members of this community."
> *[Brief exchange between Curtis and defendant Laws about how many people had signed Curtis's petition.]*
> Woolsey: "You know, a lot of people in this community are angry with you."
> Curtis: "That's exact—that's even more reason for us to be here."

| | |
|---|---|
| Woolsey: | "Oh, is it?" |
| Curtis: | "You think that Berkeley, California, or Portland, Oregon is the best place to do outreach?" |
| Woolsey: | "Our job is to keep the peace in the community. When you come in on a day that people are trying to enjoy the holiday and you stir them up, we get calls and complaints about your protest—"[6] |
| Curtis: | "About having conversations? They need to look in the mirror. If people are so triggered and so upset with having a conversation, they need to look in the mirror." |
| Woolsey: | "You know what? You need to have a bit more compassion—" |
| Curtis: | "'k." |
| Woolsey: | "—with people." |
| Curtis: | "'k." |
| Woolsey: | "You don't understand. Smithfield has shut down." |

83. Defendant Woolsey told Curtis and the other three activists still present, "We're going to issue you a citation for disorderly conduct. If you decide you want to continue, we'll arrest you. It's up to you. You just can't come into a community [*responds to something on radio*] and pour salt in the wounds."

84. At this point, Curtis stated, "I'm not interested in talking to you anymore, Sir."

85. Laws handed the identification cards to Defendant Woolsey, who left with them. Curtis and the others were unable to leave without their driver's licenses.

86. Upon information and belief, Defendant Woolsey ran a warrant check on the names. The search reflected that no warrants were outstanding.

87. Defendant Woolsey returned with the identifications. Defendant Woolsey issued Curtis a citation for disorderly conduct. Defendants Woolsey and Laws stated that the reason others were not being cited was because they stopped their speech efforts when they were told to.

---

[6] Curtis had already pointed out to Woolsey and Laws that neither he nor the group was protesting.

88.   Defendant Laws admitted there were at least two men in the same public park conducting outreach (proselytizing) at the same time as Curtis (and, separately, Alex and Leo).  Laws admitted that these men had not been told to stop.  According to Laws, they were not asked to stop because no one in the community had complained about their speech.

89.   Defendant Woolsey continued lecturing Plaintiffs about their speech, at one point stating, "They [members of the community] have a hard time with people from outside of the community coming in and telling them what they should be believing. They don't believe that in the first place. It just makes them upset…. I don't have any problems with your beliefs. It's just I can't have your beliefs and the beliefs of the community causing any problems."

90.   During this encounter at the table, Defendant Woolsey continued to prevent Curtis from communicating with members of the public.  For example, when one person approached to inquire as to what was going on, Woolsey prevented Curtis from responding.  Woolsey told the person that Curtis and his group were trying to shut Smithfield down and deterred the person from communicating directly with Curtis.

91.   Defendant Woolsey warned the activists not to attempt any speech at two public events taking place later that evening, horse races and a rodeo.  Woolsey reaffirmed that his actions toward Plaintiffs were due to Plaintiffs' views (particularly as they related to Smithfield Foods), and that he was acting at the instance of Defendant Sheriff Noel:

     Woolsey:     "I'm asking you not to go up to horse races, 'k?[7] Or up to the rodeo

---

[7] Defendant Woolsey said "I'm asking you," but he had repeatedly demonstrated that his true meaning of "ask" was a demand.  For example, Woolsey admits citing Curtis for continuing to attempt speech after being "asked" not to.

tonight. Because that will be a problem. I can't stress enough how much people are pissed off…. I actually fear for you guys. They'll probably kick your ass, 'k? I don't want that to happen. Everybody in this community, 75 percent of the people work with Smithfield, right? And they've lost their job, they've lost their livelihood. There's a lot of people that have a lot of hard feelings. And they have a hard time with people from outside the community coming in and telling them what they should be believing. It just makes them upset, 'k? Then they report to us, they want us to do something, 'k? I don't want there to be a confrontation, 'k? The Sheriff asked me – the community asked me to come down and settle things down, that's what I'm doing, OK?"

92.     Defendant Woolsey admitted there had not been any problem with persons in the park.  But those people were "sober," he said, whereas people at the races were likely to be drunk and to "kill" Plaintiffs.  ("You'll definitely get killed up there…. These guys here [*in the park*] were sober, but if they get a little bit of liquor in 'em up at the horse races, there's probably going to be a bigger issue.").  Defendant Laws concurred in this assessment of local horse race attendees:  "Inebriation doesn't hold 'em back. It's honestly for your safety."

93.     Defendant Laws ordered the activists not to go to the races and attempt to engage in speech, stating:  "We will arrest you if you go up there."  (Laws indicated that he would be annoyed if he had to go up to the races because of Plaintiffs attempting to engage in speech instead of, for example, patrolling for drunk drivers:  "You can go up there and observe and have fun all you want. As soon as you bring up the issue, you will be arrested. Because you're wasting my time coming and dealing with this stupid issue instead of looking for a DUI.")

94.     The citation for disorderly conduct issued by Defendant Woolsey requires Curtis to respond within 14 days.  To defend himself, Curtis has been required to hire an attorney.

95. Plaintiffs wish to return to Beaver County within the next 4-6 weeks leading up to the Smithfield trial in September. They wish to engage in speech in public fora. Curtis mentioned this intent to Defendants Laws and Woolsey.

96. Plaintiffs are worried that they will again be harassed, cited, threatened by law enforcement, followed, barred from recording law enforcement officials, and expelled.

97. Plaintiffs have incurred actual damages, including but not limited to: a) emotional distress from the threats of physical violence and other physical and verbal aggression by the defendants; b) travel expense for their efforts at communication that were truncated and thwarted by the Defendants; c) the production cost of a UARC canopy, which was created specifically for the Beaver outreach; d) Curtis's costs of defending against the disorderly conduct citation, including future travel to Utah for court appearances; and e) the cost of procuring counsel to obtain court protection for their imminent visit to Beaver County.

98. In the alternative only, Plaintiffs are entitled to (at minimum) nominal damages for each violation of their constitutional rights.

99. Plaintiffs have been required to retain the services of a seasoned civil rights attorney to vindicate their rights, and to seek to provide protection to Plaintiffs through immediate injunctive relief as well as other relief sought herein.

## FIRST CLAIM FOR RELIEF
### *42 U.S.C. § 1983 and Utah Const. Art. I, §§ 1, 15*

100. Plaintiffs hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

101. At all times relevant hereto, Plaintiffs had clearly established rights under the First Amendment of the United States Constitution, and Art. I, §§ 1 and 15 of the Utah

Constitution, to speak to members of the public about their views and to observe public events, including the activities of law enforcement officers in public locations.

102. At all times relevant hereto, and in performance of the acts set forth herein, Defendants Noel, Woolsey, Laws, and Beaver County acted under color of state law.

103. At all times relevant hereto, and in performance of the acts set forth herein, Defendants actively and personally caused the violation of constitutional rights alleged herein.

104. Defendants' conduct alleged herein—including, but not limited to, preventing speech, and discriminating and retaliating against Plaintiffs based upon Plaintiffs' speech, viewpoints, and the content of their speech—violated Plaintiffs' constitutional rights.

105. The unlawful misconduct of Defendants was objectively unreasonable, flagrantly unlawful, and undertaken intentionally with willful indifference to Plaintiffs' rights.

106. Defendants' actions violated Plaintiffs' clearly established constitutional rights of which reasonable police officers are or should be aware.

107. Beaver County is liable for the actions described herein because (collectively and in the alternative):

    a. The actions were caused or directed by defendant Noel, a final decision-making authority;

    b. According to Defendants Woolsey and Laws, Beaver County has a policy of requiring individual speakers on public sidewalks and other public fora to obtain permits before attempting to engage in speech;

c. Multiple members of the Sheriff's Office, including the Sheriff, a sergeant, and a deputy, all apparently believed the actions herein were permitted, suggesting a custom, policy, or practice;

d. The fact that multiple members of the Sheriff's Office, including the Sheriff, undertook patently unlawful conduct, suggests a complete or reckless lack of training on a subject that officers will encounter on a regular basis.

108. Defendants' unlawful actions caused Plaintiff to incur costs in defending against the citation and the criminal information.

109. Plaintiff is further entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest, and costs as allowable by federal law.

## SECOND CLAIM FOR RELIEF

*(Declaratory and injunctive relief)*

110. Plaintiffs incorporate all other allegations of this Complaint as if fully set forth herein.

111. Defendants' conduct has caused Plaintiffs to suffer irreparable harm.

112. Plaintiffs intend to return to Beaver County in the near future to engage in similar speech. Unless this Count enjoins Defendants, Defendants will continue to cause irreparable harm to Plaintiffs through violation of their rights to free speech.

113. Plaintiffs fear that, without a court order, they will again be subjected to unconstitutional harassment, threats, arrest, criminal charges, and other retaliation and actions violative of their rights.

114. Plaintiffs are likely to succeed on the merits of their constitutional claims.

115.    Plaintiffs are likely to suffer the same violations upon their future outreach efforts in Beaver because, among other things,

    a.    In the future, Plaintiffs intend to engage in outreach efforts in Beaver County, similar to those efforts described herein;

    b.    Defendants' conduct that is complained of herein was directed or sanctioned by Defendant Noel, the head law enforcement officer and a final decision-making authority for Beaver County;

    c.    Defendant Noel has previously, publicly expressed animosity toward Plaintiffs;

    d.    According to Defendants Woolsey and Laws, Beaver County has a policy of requiring individual speakers on public sidewalks and other public fora to obtain permits before attempting to engage in speech;

    e.    Defendants Woolsey and Laws threatened Plaintiffs that if Plaintiffs attempted to speak out at future Beaver County events, then they would arrest Plaintiffs;

    f.    Multiple members of the Sheriff's Office, including the Sheriff, a sergeant, and a deputy, all apparently believed the actions herein were permitted, suggesting a custom, policy, or practice that would be repeated;

    g.    The fact that multiple members of the Sheriff's Office, including the Sheriff, undertook patently unlawful conduct, suggests a complete or reckless lack of training on a subject that officers will encounter on a regular basis.

116.    No one but this Court can provide protection to Plaintiffs' rights.

117.    The continued injury to Plaintiffs outweighs any damage to Defendants that could be caused by an injunction.

118. An injunction is in the public interest, as the Supreme Court has repeatedly recognized that honoring First Amendment rights is paramount in our society.

119. Plaintiffs are entitled to a declaration that Defendants have violated Plaintiffs' constitutional rights to free speech. The Court should enter injunctive relief against Defendants requiring that Defendants cease their unlawful violation of Plaintiffs' First Amendment rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs requests the entry of judgment in their favor and against Defendants as follows:

1. A declaratory judgment, pursuant to 28 U.S.C. § 2201, declaring that Defendants' actions violated Plaintiffs' First Amendment rights to publish, speak on, and observe matters of public concern.

2. A judgment awarding compensation to Plaintiffs for their economic and non-economic loss and other personal injury resulting from the violation of their constitutional rights.

3. A judgment assessing punitive damages against the individual Defendants if so found by the jury.

4. A judgment awarding Plaintiffs their costs of suit, including reasonable attorney fees and litigation expenses, under 42 U.S.C. § 1988.

5. A judgment awarding Plaintiffs pre-judgment interest to the extent permitted by law.

6. Nominal damages to the extent a factfinder determines that a particular constitutional violation did not cause actual damages.

7.      A judgment awarding such other and further relief, including equitable relief, to which

Plaintiffs may be entitled.

DATED this 2nd day of August, 2022.

CHRISTENSEN & JENSEN, P.C.


/s/ Karra J. Porter
Karra J. Porter
Anna P. Christiansen
*Attorneys for Plaintiffs*



JURY TRIAL DEMANDED
Plaintiffs request a jury trial on all issues under the
Seventh Amendment of the United States Constitution.